UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRUSTEES OF THE UFCW LOCAL 152 RETAIL MEAT PENSION FUND AND THE UFCW LOCAL 152 RETAIL MEAT PENSION FUND,<br><br>Plaintiffs,<br><br>v.<br><br>INCOLLINGO'S ASSOCIATES, INC., d/b/a INKY'S DISCOUNT LIQUORS, *et al.*,<br><br>Defendants. | Case No. 22–cv–04128–ESK–AMD<br><br>OPINION |

**KIEL, U.S.D.J.**

    **THIS MATTER** is before the Court on the motion for summary judgment (Motion) (ECF No. 80) of plaintiffs the Trustees of the UFCW Local 152 Retail Meat Pension Fund (Fund) against defendant Incollingo's Associates, Inc., d/b/a Inky's Discount Liquors (Inky's). The Fund filed a brief in support of the Motion (ECF No. 80–1 (Mov. Br.)) and a statement of material facts (ECF No. 80–2 (Fund SOMF)). Inky's opposed the Motion (ECF No. 82 (Opp'n. Br.)) and filed a counter statement of material facts (ECF No. 82–1 (Inky's Counter SOMF)). The Fund filed a reply to Inky's opposition. (ECF No. 84 (Reply Br.).) For the following reasons, the Motion will be GRANTED and judgment will be entered in favor of the Fund and against Inky's.

## I.     FACTS AND PROCEDURAL HISTORY

The relevant facts are undisputed.

### A.     The Fund

The Fund is an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1002(3), an "employee benefit pension plan" as defined in Section 3(2) of ERISA, 29 U.S.C. §1002(2), and a "multiemployer plan" as defined in ERISA Sections 3(37) and 4001(a)(3), 29 U.S.C. §1002(37) and 29 U.S.C. §1301(a)(3). (Fund SOMF ¶1.) The Fund is governed by the provisions of ERISA, 29 U.S.C. §1001 *et seq.*, the Internal Revenue Code, 26 U.S.C. Section 25B, *et seq.*, as well as an Agreement and Declaration of Trust (Trust Agreement), and the Fund's Plan (Plan Document). (*Id.* ¶4.)

The Fund provides retirement benefits to eligible participants and beneficiaries including the former employees of defendant Vin-Inco Enterprises, Inc. (Vin-Inco) and non-party Incollingo Holding Company Inc (Holding Company) in their retail food stores. (*Id.* ¶5.) The trustees of the Fund are fiduciaries pursuant to ERISA Sections 3(21)(A) and 402(a), 29 U.S.C. 1002(21)(A) and 29 U.S.C. §1102(a). (*Id.* ¶7.) The trustees of the Fund are empowered to bring this action on behalf of the Fund pursuant to ERISA Section 430l(a)(l), Section 430l(b), and Section 502(a)(3), 29 U.S.C. §1451(a)(l)–(b), and 29 U.S.C. §1132(a)(3). (*Id.* ¶8.)

The Fund is financed by contributions from participating employers pursuant to collective bargaining agreements (CBAs or CBA) between the United Food and Commercial Workers Union Local, 152 (Union) and employers in the retail food industry. (*Id.* ¶9.) When a multiemployer defined benefit pension plan is underfunded, the funding shortfall is made up through assessment of withdrawal liability to participating employers based upon a partial or complete withdrawal. (*Id.* ¶10.)

2

Cheiron is an actuarial consulting firm that performs actuarial and consulting services to the Fund, including testing for and determining the amount of withdrawal liability when a signatory employer fails to remit pension contributions to the Fund. (*Id.* ¶ 12.)

### B. Vin-Inco

Vin-Inco operated a food store in Penns Grove, New Jersey. (*Id.* ¶ 16.) Edward Incollingo Sr. and his wife, Patricia Incollingo were the original owners. (*Id.* ¶ 17.) In the early 2000s, Edward Incollingo, Sr. transferred ownership of Vin-Inco to his four children: Edward Incollingo Jr., Patricia Cardoso, Joseph Incollingo (collectively, Three Siblings), and Mario Incollingo (collectively with the Three Siblings, Four Siblings). (*Id.* ¶ 18.) The Four Siblings owned equal one-quarter shares of Vin-Inco. (*Id.* ¶ 19.)

In approximately 2009, a family dispute between Mario Incollingo and the Three Siblings resulted in a change in the ownership structure of Vin-Inco and other entities that were owned by the Four Siblings. (*Id.* ¶ 20.) This change was memorialized in the Stock Transfer and Exchange Agreement (Transfer Agreement) dated January 1, 2010. (*Id.*) The Three Siblings purchased Mario Incollingo's share of Vin-Inco and became equal one-third owners of Vin-Inco. (*Id.* ¶ 21.) The ownership structure of Vin-Inco did not change again. (*Id.*)

Vin-Inco was an employer within the meaning of ERISA Section 3(5), 29 U.S.C. § 1002(5) and Section 2(2) of the National Labor Relations Act, 29 U.S.C. 152(2), and is engaged in an industry affecting commerce within the meaning of ERISA Section 3(11) and 3(12), 29 U.S.C. § 1002(11) and (12). (*Id.* ¶ 14.)

In September of 2022, Vin-Inco closed its only retail grocery store and subsequently stopped making contributions to the Fund. (*Id.* ¶ 22.) Vin-Inco filed for bankruptcy in October 2022. (*Id.*)

### C. Holding Company

The Four Siblings formed Holding Company in the early 2000s to operate a supermarket in Salem, New Jersey. (*Id.* ¶¶ 23, 25.) Like Vin-Inco, Holding Company's ownership structure changed on January 1, 2010 under the Transfer Agreement because of the family dispute between Mario Incollingo and the Three Siblings. (*Id.* ¶ 26.) Pursuant to the Transfer Agreement, the Three Siblings bought out Mario Incollingo's share and became equal one-third owners of Holding Company. (*Id.* ¶ 27.)

Holding Company closed its only retail food store in Salem, New Jersey in 2017 and filed for bankruptcy on December 14, 2017. (*Id.* ¶¶ 28, 29.) The Fund did not sue Holding Company in this case because Holding Company filed for bankruptcy before the complaint in this case was filed. (*Id.* ¶ 30.)

### D. Inky's

The Four Siblings formed Inky's in 1999 to purchase and operate a pre-existing liquor store in Penns Grove, New Jersey. (*Id.* ¶ 31.) Originally, the Four Siblings each owned equal one-quarter ownership of Inky's. (*Id.* ¶ 32.) Like Vin-Inco and Holding Company, Inky's ownership structure changed on January 1, 2010.. (*Id.* ¶ 33.) Pursuant to the Transfer Agreement, the Three Siblings bought out Mario Incollingo's share and became equal one-third owners of Inky's. (*Id.* ¶ 34.) Inky's is an ongoing business. (*Id.* ¶ 35.)

Accordingly, starting in 2010, the Three Siblings each had a one-third ownership of Vin-Inco, Holding Company, and Inky's. (*Id.* ¶ 36.)

### E. Imposition of Withdrawal Liability

Vin-Inco and Holding Company operated retail food stores and were parties to a series of CBAs with the Union that required them to remit contributions to the Fund for the purpose of providing retirement income to their employees as participants in the Fund. (*Id.* ¶ 37.) Vin-Inco and Holding Company made contributions to the Fund under the terms of the successive

4

CBAs, including the most recent CBA. (*Id.* ¶ 38.) Vin-Inco and Holding Company continued to make contributions pursuant to the CBAs, until Holding Company's store closed in 2017 and Vin-Inco's store closed in September 2022. (*Id.* ¶ 39.)

### 1. **Partial Withdrawal Liability**

Vin-Inco incurred partial withdrawal liability from the Fund as of the plan year ending on June 30, 2018.[1] (*Id.* ¶ 42.) The partial withdrawal liability was triggered by a 35% decline in contributions by defendants[2] to the Fund. (*Id.* ¶ 43.) Based on subsequent testing, a partial liability was also triggered in the plan years ending on June 30, 2019, 2020, and 2021 due to 35% declines in contributions over each of those years. (*Id.* ¶ 44.)

In accordance with ERISA Section 4211, 29 U.S.C. 1391, and the applicable provisions of the Fund's Trust Agreement, the Fund calculated Vin-Inco's partial withdrawal liability for the plan year ending on June 30, 2018 to be $2,229,745. (*Id.* ¶ 45.) On July 22, 2020 the Fund notified Vin-Inco and Holding Company of the amount of its partial withdrawal liability for the plan year ending June 30, 2018, setting forth the schedule for liability payments, and demanding payments in accordance with a schedule. (*Id.* ¶ 46.)

---

[1] The Fund explains that payment of withdrawal liability is necessary for the Fund to maintain its financial integrity and to pay retirement benefits to eligible participants and their beneficiaries. (Fund SOMF ¶ 67.) Non-payment of withdrawal liability may impair the funding status of the Plan and the ability to provide retirement income to eligible participants and their beneficiaries. (*Id.* ¶ 68.) The Fund is required to pay retirement benefits to defendants' employees even if the withdrawal liability is not paid. (*Id.* ¶ 69.) A further purpose of withdrawal liability is to prevent a "domino effect" whereby once the first employer withdraws from a fund the remaining employers begin to do so, to avoid being the last remaining employer left "holding the bag." *See Resilient Floor Covering Pension Trust Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1088–89 (9th Cir. 2015).

[2] "[D]efendants" refers to all of the original defendants in this case.

Vin-Inco failed to make the initial scheduled payment due on September 20, 2020. (*Id.* ¶ 48.) The Fund sent a follow-up letter to Vin-Inco and Holding Company, dated November 20, 2020, demanding payment. (*Id.* ¶ 49.) Due to Vin-Inco's and Holding Company's failure to make the quarterly payments, the Fund notified Vin-Inco of its delinquency by letter dated June 8, 2021, advising that if the delinquency was not cured within 60 days the Fund would file a lawsuit to collect on the outstanding amount of withdrawal liability and for other relief. (*Id.* ¶ 50.)

Vin-Inco and Holding Company have not made any payments on the withdrawal liability and have not contested the withdrawal liability calculation. (*Id.* ¶¶ 51, 52.)

### 2.   **Complete Withdrawal Liability**

Vin-Inco and Holding Company incurred a complete withdrawal from the Fund for the plan year ending June 30, 2023, because of the closing of Vin-Inco's food store. (*Id.* ¶ 53.) On December 28, 2022, the Fund notified Vin-Inco and Holding Company of the complete withdrawal liability to the Fund for the plan year ending June 30, 2023 in the amount of $1,566,967. (*Id.* ¶ 55.) The Fund again notified Vin-Inco and Holding Company of their liability due to the partial withdrawal from the pension fund for the plan year ending on June 30, 2018 ($2,229,745), and advised them of additional partial withdrawal liability for the plan years ending on June 30, 2019 ($1,595,999), June 30, 2020 ($451,961), and June 30, 2021 ($273,550). (*Id.* ¶ 56.) The Fund also demanded payment from Vin-Inco and all trades or businesses under common control. (*Id.* ¶ 57.)

Vin-Inco and Holding Company failed to timely challenge the Fund's complete withdrawal liability and updated partial withdrawal liability assessments. (*Id.* ¶ 58.)

### 3.  Total Withdrawal Liability, Interest, Liquidated Damages

Pursuant to Article XIV Section 1 of the Plan Document, an employer who fails to make timely payment of any installment of withdrawal liability shall also pay interest and liquidated damages of twenty percent of the delinquent sum.  (*Id.* ¶ 59.)  Pursuant to Article XIV Section 2 of the Plan Document, if an employer defaults, the trustees of the Fund may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest.  (*Id.* ¶ 60.)

The Plan Document identifies an employer's insolvency, dissolution, or the filing or commencement of a proceeding relating to bankruptcy as an event of default.  (*Id.* ¶ 61.)  The withdrawal liability amounts are as follows:

> Partial withdrawal liability, plan year ending June 30, 2018: $2,229,745
>
> Partial withdrawal liability, plan year ending June 30, 2019: $1,595,999
>
> Partial withdrawal liability, plan year ending June 30, 2020: $451,961
>
> Partial withdrawal liability, plan year ending June 30, 2021: $273,550
>
> Complete withdrawal liability, plan year ending June 30, 2023: $1,566,967
>
> **Total withdrawal liability: $6,118,222.**

(*Id.* ¶ 62) (emphasis in original).

As of July 31, 2024, interest and liquidated damages has been calculated as follows:

> Interest $720,163.67
>
> Liquidated Damages $1,223,644.40.

(*Id.* ¶ 63.) Interest was calculated on all amounts due and owing from Defendants as of the due date of the first payment which was not timely made (February 26, 2023), and in accordance with 29 C.F.R. 4219.32. (*Id.* ¶ 64.) As of July 31, 2024, the total withdrawal liability, interest, and liquidated damages total $8,062,030.07.[3] (*Id.* ¶ 65.) No payments were made on the withdrawal liability. (*Id.* ¶ 66.)

## II.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III.  DISCUSSION

### A.  Joint and Several Liability

When a multiemployer defined benefit pension plan is underfunded, the funding shortfall is recovered through assessment of withdrawal liability to participating employers based upon a partial or complete withdrawal. (Fund SOMF ¶ 40.) Generally, partial withdrawal liability to a multiemployer pension fund is triggered in the retail food industry when there is a decline over a period of time of 35% or more of an employer's required contributions, ERISA

---

[3] Inky's "neither admits nor denies the amounts claimed due [but] disputes it is legally" responsible for the alleged liability. (Inky's Counter SOMF ¶¶ 62–64.)

Section 4205(b)(1), 29 U.S.C. §1386. (*Id.* ¶41.) Here, plaintiffs have calculated the amount of partial and complete withdrawal liability of Vin-Inco and Holding Company. However, because Vin-Inco and Holding Company have ceased operations and filed for bankruptcy, the Fund seeks payment of the liability from Inky's as a business under common control with Vin-Inco and Holding Company. (Mov. Br. p.18.)

Pursuant to ERISA Section 4201, an employer who withdraws from a multiemployer plan is obligated to pay complete or partial withdrawal liability to the fund for its proportionate share of the fund's unfunded benefits. 29 U.S.C. §1381. ERISA Section 4211 sets forth the methods for calculating the amount of withdrawal liability and requires the fund to "demand payment in accordance with the schedule." 29 U.S.C. §1391. Within 90 days of receiving this notice and demand of payment, the employer must review, identify inaccuracies, and/or provide additional information to the plan sponsor if the employer wishes to contest the withdrawal liability determination. 29 U.S.C. §1399(2)(A). "The employer may then seek arbitration of the review determination within 60 days after (1) the date he receives the review determination or (2) 120 days after he first requests review, whichever is earlier." *Bd. of Trustees v. Johnson*, 606 F. Supp. 231, 232–33 (9th Cir. 1987). Section 4221(a) of ERISA requires the employer to request arbitration to resolve any disputes concerning a determination of withdrawal liability. 29 U.S.C. 1401(a)(1). If the employer does not initiate arbitration proceedings within 60 days, "the amounts demanded by the plan sponsor under Section 4219(b)(1) [29 U.S.C. §1399(b)(1)] shall be due and owing on the schedule set forth by the plan sponsor and the plan may file a lawsuit for collection." 29 U.S.C. §301(b)(1); *see Cent. States, Southeast & Southwest Areas Pension Fund v. Allega Concrete Corp.*, 772 F.3d 499, 501 (7th Cir. 2014) (employer who failed to make proper, timely demand for arbitration waived right to arbitration).

Under ERISA and the Multiemployer Pension Plan Act (MPPAA), when withdrawal liability is imposed upon an employer, liability also extends to "all 'trades or businesses (whether or not incorporated) which are under common control,' with the withdrawing employer." 28 U.S.C. §1301(b)(1); *Gov't Dev. Bank for P.R. v. Holt Marine Terminal, Inc.*, 765 F. Supp. 2d 710, 715 (E.D. Pa. 2011). "Therefore, any entity that is (1) a 'trade or business' and (2) under 'common control' with the withdrawing employer is jointly and severally liable for withdrawal liability." (*Id.*) An entity is engaged in a trade or business if it is "involved in the activity: (1) with continuity and regularity; and (2) for the primary purpose of income or profit." (*Id.*) However, this analysis is not applied rigidly by the courts, which have "instead undertaken a factual inquiry to determine whether characterizing an entity as a 'trade or business' will fulfill the underlying purpose of the MPPAA: to prevent employers from avoiding withdrawal liability by fractionalizing their operations." (*Id.*)

ERISA applies the Internal Revenue Service's (IRS) definition of "common control" for purposes of evaluating withdrawal liability. *Brown v. Astro Holdings, Inc.*, 385 F. Supp. 2d 519, 528 (E.D. Pa. 2005). The IRS considers companies to be under "common control" when they are linked by either a parent corporation or a group of five or fewer individuals who control 80 percent of a company's voting shares or profits. (*Id*. at 520.) The regulations identify and define three types of groups as businesses operated under common control: parent-subsidiary groups; brother-sister groups; and combined groups. 26 C.F.R. 1.414(c)–2(a).

The Fund asserts that Vin-Inco, Holding Company, and Inky's are a "brother-sister" group to which joint and several liability applies to the withdrawal liability. (Mov. Br. p.20.) A brother-sister group consists of two or more trades or businesses if:

> (i) the same five or fewer persons who are individuals, estates, or trusts, own (directly and with the application of

10

> [26 C.F.R.] 11.414(c)-4), singly or in combination, a controlling interest of each organization, and (ii) taking in to account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.

26 C.F.R. 11.414(c)-2(c)(1).

Inky's disagrees. It concedes that Vin-Inco, Holding Company, and Inky's are a "trade or business" that had "identical ownership," consisting of the Three Siblings owning equal shares of each business. (Opp'n. p. 4.) However, Inky's argues that it was never part of the series of CBAs and therefore, cannot be liable to the Fund. (*Id.* pp. 4, 5.) Inky's also argues that it cannot be held responsible for the withdrawal liability because it did not have an "economic nexus" with Vin-Inco and Holding Company. (*Id.* p. 6.) Inky's further argues that the Fund has not established a "nexus, tenuous or direct between the businesses [because] [] [n]o products were bought or sold between the entities, nor were there any leases or contacts between them … [and the businesses] operate[d] and conducted business solely separate and apart from one another." (*Id.* p. 9.)

Here, I agree with the Fund and find that Inky's is a "trade or business" under "common control" with Vin-Inco and Holding Company, and is jointly and severally liable for the withdrawal liability. In their reply brief, the Fund correctly notes that Inky's relies on an overturned case in support of its claim that there is an "economic nexus" requirement. (Reply Br. p. 4; *see* Opp'n Br. p. 6, *citing Connors v. Incoal, Inc.*, 781 F.Supp. 50 (D.D.C. 1992).) The District of Columbia Circuit reversed the district court's decision. *Connors v. Incoal, Inc.*, 995 F.2d 245, 254–55 (D.C. Cir. 1993) ("there is *no* 'economic nexus' requirement that an enterprise must meet in order to qualify as a 'trade or business.' Indeed, it is not even *relevant,* let alone dispositive, that there is, or is not, an economic nexus") (emphasis in original); *see also, Local 478 Trucking*

11

*and Allied Industries Pension Fund v. Jayne*, 778 F.Supp. 1289, 1305 (D.N.J. 1991) ("[N]o showing of an economic relationship is necessary under 29 U.S.C. § 1301(b)(1)").

Moreover, the Fund correctly asserts that Vin-Inco, Holding Company, and Inky's (the Companies) are a "brother-sister" group . The Companies are owned by the Three Siblings, who, in combination, own controlling interest. "A controlling interest in a corporation is defined in 26 C.F.R. 1.414(c)–2(b)(2)(A) as 'ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation.'" *Auto. Indus. Pension Tr. Fund v. Fitzpatrick Chevrolet Inc.*, 833 F. Supp. 2d 1162, 1165 (N.D. Cal. 2011). The Three Siblings, collectively, own 100 percent of the Companies and their ownership interest includes voting power. (ECF No. 80–12 (Agreement & Declaration of Trust) p.11.)[4]

### B. Additional Relief

Inky did not challenge the Fund's calculation of withdrawal liability and the Fund's request for interest and liquidated damages.[5] However, in addition to the unpaid contribution, courts shall award a prevailing plan seeking collection of withdrawal liability: (1) interest on the unpaid contributions, (2)

---

[4] Although Inky's does not raise an argument that it did not receive notice of the withdrawal liability, notice to the employer-corporation serves as constructive notice to all other members of a controlled group as this "is consistent with the language and purpose of both ERISA and the MPPAA … because all trades or businesses under common control 'shall be treated ... as a single employer,' notice to one should be notice to all." *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986).

[5] Inky's "denie[d] legal responsibility for liquidated damages and interest" in its response to plaintiff's statement of undisputed material facts. (*See* Inky's Counter SOMF ¶64.) However, its brief did not explain why additional liability for liquidated damages and interest should not be imposed.

an amount equal to the greater of either interest on the unpaid contributions or "liquidated damages provided for under the plan in an amount not in excess of 20 percent … of the [unpaid contributions]," (4) "reasonable attorney's fees and costs of the action," and (5) "such other legal or equitable relief as the court deems appropriate."  29 U.S.C. 1132(g)(2); *see also Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Bellezza Co. Inc.*, 57 Fed. App'x. 972, 975 (3d Cir. 2003) (the remedies noted are "mandatory in an action brought by a pension fund to enforce the collection of contributions").

The Plan Document provides that if an employer fails to make payment of withdrawal liability, the employer shall pay, "in addition to the amount owed, interest on the unpaid installments plus liquidated damages of twenty (20%) percent of the delinquent sum."  (Fund SOMF ¶¶ 59, 60.)  Additionally, an employer is required to contest the findings in the withdrawal liability notice within 60 days. *PACE Indus. Union Mgmt. Pension Fund v. Troy Rubber Engraving*, 805 F. Supp. 2d 451, 456–57 (M.D. Tenn. 2011); *see also Tr. Nat. Recruitment Fund v. Fireservice*, 384 F. Supp. 3d 412, 422 ( "if an employer fails to arbitrate a dispute over its withdrawal liability, it generally waives the right to contest the propriety and amount of withdrawal liability").

Inky did not object to the notices from the Fund.  Accordingly, Inky's waived its right to dispute the amount and is liable for $1,223,644.40 in liquidated damages (Fund SOMF ¶ 63).

## IV. CONCLUSION

For the foregoing reasons, judgment will be entered in favor of the Fund and against Inky's for $6,118,222 in withdrawal liability, interest of $720,163.67, and liquidated damages of $1,223,644.40.

                                                      */s/ Edward S. Kiel*
                                                     **EDWARD S. KIEL**
                                                     **UNITED STATES DISTRICT JUDGE**